IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **AARON PRIVATE CLINIC MANAGEMENT, LLC,** <br><br> Plaintiff, <br><br> v. <br><br> **FRANK W. BERRY, in his Official Capacity as Commissioner of the Georgia Department of Community Health; and NATHAN DEAL, in his Official Capacity as Governor of Georgia,** <br><br> Defendants. | 1:17-cv-1034-WSD |

## OPINION AND ORDER

This matter is before the Court on Defendants Frank W. Berry and Nathan Deal (together, "Defendants") Motion to Dismiss [23].

## I. BACKGROUND

On May 4, 2017, Plaintiff Aaron Private Clinic Management, LLC ("Plaintiff") filed its First Amended Complaint seeking declaratory and injunctive relief, and damages, for violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 793 ("Rehabilitation Act") and the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"). Plaintiff, a for-profit company that

"intends to meet the standards to establish an [opioid treatment program] in Georgia," alleges that two recently promulgated Georgia statutes—O.C.G.A. § 26-5-21 ("Licensing Moratorium")[1] and O.C.G.A. § 26-5-40 et seq. ("Licensing Cap")[2]—"illegally discriminate against the disabled, including barring the

---

[1] The Licensing Moratorium, enacted by the Georgia Legislature in 2016, provides the following:
> A temporary moratorium on the acceptance of new applications for licensure of narcotic treatment programs authorized under this article through June 30, 2017, would provide the General Assembly with time to study the need for any changes to the licensure requirements for the operation of such programs and the enactment of any other additional laws to ensure the safety of Georgia's citizens. New applications for licensure of narcotic treatment programs in this state shall be temporarily suspended starting from June 1, 2016, through and including June 30, 2017, in order to permit the commission to complete its report and recommendations and to permit the General Assembly to act on those recommendations during the 2017 legislative session.
> . . .
> Between June 1, 2016, and June 30, 2017, the department shall not accept any new applications for licensure of narcotic treatment programs.

See O.C.G.A. § 26-5-21(e)-(f).

[2] The Licensing Cap, also known as the Narcotic Treatment Programs Enforcement Act ("NTPEA"), became effective on May 4, 2017 and supersedes the Licensing Moratorium. It provides that the DCH "shall create and promulgate reasonable and necessary minimum standards of quality and services for narcotic treatment programs," including those relating to, for example, adequate and safe buildings or house facilities where programs are offered, adequate equipment for the delivery of the programs, and continuing evaluation of the effectiveness of programs. See O.C.G.A. § 26-5-42. The Licensing Cap contemplates an open enrollment period for narcotic treatment program licensing applications, with the

Department of Community Health ('DCH') from accepting new licenses to expand treatment for the disabled in Georgia." (First Amended Complaint [19] ("FAC") at 3-4). Plaintiff contends that "[t]hese rules illegally block [it] from establishing an [o]pioid [t]reatment [p]rogram." (Id.).

Plaintiff's First Amended Complaint asserts six counts, all based on the overarching claim that the Licensing Moratorium and Licensing Cap violate the Rehabilitation Act and Title II of the ADA because they are are facially invalid, discriminatory, and, through disparate treatment, "cause disproportionate impact to APC and the disabled persons APC intends to serve." (FAC ¶¶ 56-85). Each count also includes the following claim:

> APC has suffered economic injury from the State of Georgia's disparate impact violations of the ADA. APC's economic injuries include, without limitation, damage caused by interference and delays with planning, raising investment funds, hiring, and other normal processes related to opening a business. This has illegally caused APC damages, including, without limitation, additional costs and expenses, attorney's fees, interest, and cost of capital.

(FAC ¶ 62, 70, 73, 77, 81, 85).

On May 18, 2017, Defendants filed their Motion to Dismiss arguing that (1) Plaintiff lacks standing under the ADA and Rehabilitation Act; (2) the Eleventh

---

first open enrollment period to be held December 1, 2017 through December 31, 2017. See O.C.G.A. § 26-5-46.

Amendment and sovereign immunity bar APC's money damages claims; (3) APC cannot recover money damages because its Complaint lacks plausible, fact-based allegations of intentional discrimination; and (4) APC is not entitled to declaratory or injunctive relief. ([23.1] at 12-30).

## II. LEGAL STANDARDS

### A. Motion to Dismiss

On a motion to dismiss, the Court must "assume that the factual allegations in the complaint are true and give the plaintiff[] the benefit of reasonable factual inferences." Wooten v. Quicken Loans, Inc., 626 F.3d 1187, 1196 (11th Cir. 2010). Although reasonable inferences are made in the plaintiff's favor, "'unwarranted deductions of fact' are not admitted as true." Aldana v. Del Monte Fresh Produce, N.A., 416 F.3d 1242, 1248 (11th Cir. 2005) (quoting S. Fla. Water Mgmt. Dist. v. Montalvo, 84 F.3d 402, 408 n.10 (1996)). Similarly, the Court is not required to accept conclusory allegations and legal conclusions as true. See Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1290 (11th Cir. 2010) (construing Ashcroft v. Iqbal, 556 U.S. 662 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)); see also White v. Bank of America, NA, 597 F. App'x 1015, 1018 (11th Cir. 2014) ("[C]onclusory allegations, unwarranted deductions of facts or legal conclusions

4

masquerading as facts will not prevent dismissal.") (quoting Oxford Asset Mgmt., Ltd. V. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). Mere "labels and conclusions" are insufficient. Twombly, 550 U.S. at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). This requires more than the "mere possibility of misconduct." Am. Dental, 605 F.3d at 1290 (quoting Iqbal, 556 U.S. at 679). The well-pled allegations must "nudge[] their claims across the line from conceivable to plausible." Id. at 1289 (quoting Twombly, 550 U.S. at 570).

B. Title II of the ADA and Section 504 of the Rehabilitation Act

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

> In order to state a Title II claim, a plaintiff generally must prove (1) that he is a qualified individual with a disability; (2) that he was

> either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability.

Bircoll v. Miami–Dade Cnty., 480 F.3d 1072, 1083 (11th Cir. 2007). "The term 'qualified individual with a disability' means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). "A plaintiff can proceed on theories of intentional discrimination, disparate treatment, or failure to make reasonable accommodations." Rylee v. Chapman, 316 F. App'x 901, 906 (11th Cir. 2009).

Section 504 of the Rehabilitation Act states, in part, that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). Subject to limited exceptions, "[d]iscrimination claims under the [Rehabilitation Act] are governed by the same standards used in ADA cases." J.A.M. v. Nova Se. Univ., Inc., 646 F. App'x 921,

926 (11th Cir. 2016); see also Allmond v. Akal Sec., Inc., 558 F.3d 1312, 1316 n.3 (11th Cir. 2009) ("Because the same standards govern discrimination claims under the Rehabilitation Act and the ADA, we discuss those claims together and rely on cases construing those statutes interchangeably.").

## III. DISCUSSION

Defendants argue that Plaintiff lacks standing, or alternatively, fails to assert cognizable claims, under Section 504 of the Rehabilitation Act and Title II of the ADA. Plaintiff contends it has "three separate and independent bases of standing," including direct injury standing, associational standing, and representational standing. ([25] at 3). For the reasons discussed below, the Court determines that Plaintiff lacks standing to assert the claims alleged in this action.

"'Standing is a threshold jurisdictional question which must be addressed prior to, and independent of, the merits of a party's claims.'" Amnesty Intern., USA v. Battle, 559 F.3d 1170, 1177 (11th Cir. 2009) (quoting Bochese v. Town of Ponce Inlet, 405 F. 3d 964, 974 (11th Cir. 2005). "The standing inquiry 'is an essential and unchanging part of the case-or-controversy requirement of Article III' of the United States Constitution. Amnesty Intern., USA, 559 F.3d at 1177 (quoting Lujan v. Defenders of Wildlife, 504.U.S. 555, 560 (1992). Standing requires that a plaintiff establish "(1) an injury in fact, which is concrete and

7

particularized and actual or imminent; (2) a causal connection between the injury and the causal conduct; and (3) a substantial likelihood that a favorable decision will redress the injury." Amnesty Intern., USA, 559 F.3d at 1177; see also Granite State Outdoor Adver. v. City of Clearwater, Fla., 351 F.3d 1112, 1116 (11th Cir. 2003). The party invoking federal jurisdiction bears the burden of establishing standing. Lujan, 504 U.S. at 561.

A. "Direct Injury" Standing

Plaintiff first argues that "[b]y illegally burdening and denying Plaintiff the opportunity to obtain a license to serve the disabled, Defendants have inflicted an 'injury-in-fact' upon Plaintiff sufficient to guarantee 'concrete adverseness' and to satisfy the Supreme Court's constitutionally-based standing requirements imposed by Art. III." ([25] at 6). Plaintiff argues its "direct injury" involves "direct economic injuries proximately caused by the Defendants' violations of the ADA." ([25] at 7).[3] An "injury in fact" requires Plaintiff to show that it has suffered "an invasion of a legally protected interest which is (a) concrete and particularized, and

---

[3] Plaintiff's contention that it has suffered a "direct injury" permitting it to assert "direct injury standing" is misleading. Plaintiff does not assert that it is disabled. Plaintiff's claim is more properly characterized as an injury suffered as the result of its alleged association with, or representation of, disabled persons. The Court nevertheless examines Plaintiff's "direct injury" under the general standing requirements as if it were permitted to do so under the ADA.

8

(b) actual or imminent, not conjectural or hypothetical." Bochese v. Town of Ponce Inlet, 405 F.3d 964, 980 (11th Cir. 2005). Plaintiff's Complaint does not plead an "injury in fact."

The facts alleged in the Complaint do not show that Plaintiff has suffered a legally cognizable injury that is "actual or imminent, not 'conjectural' or 'hypothetical,'" Lujan, 504 U.S. at 560. Plaintiff is a non-disabled, for-profit corporation attempting to, at some time in the future, establish and operate an opioid treatment program to treat unidentified disabled persons. Plaintiff's Complaint lacks any specific allegations explaining how the Licensing Moratorium or Licensing Cap discriminate against it or its prospective patients. Plaintiff provides only vague assertions and legal conclusions, which are insufficient to state a claim under Iqbal, 556 U.S. at 678. For example, Plaintiff states in its Complaint:

> The Licensing Moratorium and License Cap are evidence of the State of Georgia's intentional discrimination against the disabled, and those attempting to treat them.
> . . .
> The State of Georgia's Licensing Moratorium and License Cap impose upon OTP clinics unreasonable, discriminatory requirements not imposed on similar businesses and violation Section 504 of the RA.

([19] at 16-17, 18). Plaintiff also lists in its Complaint a number of rules from the Licensing Cap—conclusorily referring to them as "arbitrary and discriminatory."

9

([19] at 14-16). Plaintiff does not allege, however, the specific rules with which it cannot comply, and does not allege why they are discriminatory or how they prevent Plaintiff from establishing its clinic in the future.

The Licensing Moratorium, which took place from June 1, 2017 to June 30, 2017,[4] was superseded by the Licensing Cap. The Licensing Cap provides for an "open enrollment" period to begin on December, 1, 2017, at which time the DCH will assess and accept license applications for treatment programs seeking to offer the same kinds of services Plaintiff alleges it wants to offer. Plaintiff has not pled any facts to support that it has attempted to apply for a license and was denied. There is also no allegation in Plaintiff's Complaint that it will be prevented from participating in the open enrollment, or that it will be unsuccessful in it. These facts alone show that Plaintiff does not, and cannot, plausibly allege that it has suffered a concrete injury.

Plaintiff acknowledges in its Complaint that it does not currently offer a treatment program, and it alleges no facts even suggesting that it is prepared to offer treatment to individuals. It alleges at most that it is in the planning process,

---

[4] The moratorium effectively extends to December 1, 2017 since the Licensing Cap provides that the DCH "shall not accept any applications for licensure until December 1, 2017," when the open enrollment period is to begin. O.C.G.A. § 26-5-46.

raising investment funds, engaging in prospective hiring, and "other normal processes related to opening a business."  (FAC ¶¶ 62, 70, 73, 77, 81, 85).  Plaintiff does not allege any facts regarding its plans to establish the program, does not assert whether it has the funds to do so, does not allege where it will locate the program,[5] does not assert how it plans to recruit clients, does not claim it has patients prepared to submit to its care, and does not allege whether it can retain practitioners or clinicians to staff the program.  Plaintiff names only an indefinite class of "prospective patients," including "pregnant women and their unborn children."  ([25] at 4).

Finally, the economic damages Plaintiff claims—"lost profits" and "costs and expenses related to the delay in opening its clinic"—are only generalized factual assertions.  ([19] at 23-24).  Beyond these vague claims, it is unclear to what extent Plaintiff has suffered monetary losses, or how its alleged losses relate to the Licensing Moratorium or Licensing Cap that Plaintiff challenges.

Plaintiff's conclusory allegations are simply not sufficient to constitute a claim of injury which is "concrete and particularized and actual or imminent."

---

[5]   The Court notes that Plaintiff alleges its principal place of business is 4403 Northside Parkway N.W., Suite 1413, Atlanta, Georgia, 30327.  ([19] at 4).  This is the same address of the law office of Plaintiff's counsel, James A. Dunlap, and other entities in which Mr. Dunlap is an officer or owner.

11

Amnesty Intern., USA, 559 F.3d at 1177. Without an alleged injury, the causal connection element is also not met, and, even if it were, open enrollment may provide the remedy Plaintiff requests. The Court finds the allegations of harm set out in Plaintiff's Complaint are "conjectural" and "hypothetical," and, were it proper to assert in this context, which the Court maintains that it is not, Plaintiff has failed to state a claim of direct injury.

B. Associational Standing

Plaintiff next asserts that it has associational standing to assert its claims. Plaintiff argues that, as a prospective medical provider to the disabled, it has standing under Title II of the ADA and Section 504 of the Rehabilitation Act to bring a claim based on injuries resulting from its prospective association with the addicted persons it hopes to serve. For the reasons discussed below, the Court finds there is no associational standing here.

In Todd v. Carstarphen, 236 F. Supp. 3d 1311, 1341 (N.D. Ga. 2017), this Court held, after engaging in an in-depth Chevron[6] analysis, that there is no associational standing under Title II of the ADA or the Rehabilitation Act. In other words, Title II does not confer standing for non-disabled persons to assert claims

---

[6] Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984).

on behalf of qualified disabled persons. The Court's Chevron analysis in Todd provided:

> Titles I and III expressly prohibit, in the employment and public accommodation contexts, discrimination against nondisabled individuals "because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4); 42 U.S.C. § 12182(b)(1)(E). That Title II does not include this enlarging language supports Congressional intent to omit associational discrimination claims from Title II.
> . . .
> Applying the admonition in Chevron that the matter of what a statute requires is at an end if Congressional intent is clear in light of the "traditional tools of statutory construction," 467 U.S. at 843 n.9, 104 S.Ct. 2778, the Court finds that Title II protects only "individual[s] with a disability," 42 U.S.C. § 12132.

Todd, 236 F. Supp. 3d at 1339-1340.

> After engaging in the Chevron analysis, the Court concluded:
>
> Title II protects only "individual[s] with a disability," 42 U.S.C. § 12132. To the extent 28 C.F.R. § 35.130(g) provides a cause of action for discrimination against nondisabled individuals, it "plainly contradict[s] the statute" and is not enforceable. Shotz, 344 F.3d at 1179; see United States v. Dierckman, 201 F.3d 915, 923 (7th Cir. 2000) ("[I]f the plain meaning of the text of the statute either supports or opposes the regulation, the inquiry ends, and this court applies the statute's plain meaning." (citation and internal quotation marks omitted)); cf. Noel v. N.Y. City Taxi & Limousine Comm'n, 687 F.3d 63, 68 (2d Cir. 2012) ("Although the ADA is to be interpreted broadly, the scope of Title II is not limitless." (citation and internal quotation marks omitted)).
> . . .

> The Eleventh Circuit has not addressed the viability of Title II associational discrimination claims under the Rehabilitation Act. The Court, applying the plain language of the statute, finds that the Rehabilitation Act does not protect nondisabled individuals from discrimination in the Title II context.

Todd, 236 F. Supp. 3d at 1340-42. For the reasons stated in Todd, Plaintiff does not have associational standing in this action.[7]

Even if associational standing were permitted under Title II, which this Court believes it is not, it would not apply here. Associational standing is, at most, and assuming it exists in this Circuit in Title II and Section 504 cases, a limited exception to the general requirement that a plaintiff be disabled or already providing services to disabled persons. For example, in McCullum v. Orlando Regional Healthcare System, Inc., 768 F.3d 1135, 1142 (11th Cir. 2014), a case brought under Title III of the ADA,[8] the Eleventh Circuit held that "a non-disabled individual has standing to bring suit under the ADA only if she was personally discriminated against or denied some benefit because of her association with a

---

[7] The Court also reminds Plaintiff that the Northern District of Georgia is not bound by the law of other circuits. Plaintiff attempts to distinguish Todd by arguing cases from other circuits. The Court does not find these other cases persuasive.

[8] Although McCullum involved Title II and Title III claims, the Eleventh Circuit's discussion regarding associational standing appears to encompass only the Title III claim. 786 F.3d at 1142 (referring only to and quoting language only from 42 U.S.C. § 12182(b)(1)(E), not 42 U.S.C. § 12132).

14

disabled person." Here, in this Title II case, Plaintiff does not provide specific allegations of discrimination based on the alleged disability of someone with whom Plaintiff is associated. Plaintiff is not associated with anyone who may be disabled because it does not, cannot, and may not ever provide service to patients. There simply is no association upon which Title II or Section 504 of the Rehabilitation Act can be based.

    C.    <u>Representational Standing</u>

Plaintiff's argument that it has representational standing to assert claims on behalf of its anticipated "constituents" also fails. As discussed <u>supra</u>, § III.B., Title II of the ADA and Section 504 of the Rehabilitation Act protect only those individuals with a disability. <u>Todd</u>, 236 F. Supp. 3d at 1341. Plaintiff cannot assert a claim as a representative of a prospective opioid-addicted clientele under these particular statutes. Even if representational standing were permitted under Title II of the ADA or Section 504 of the Rehabilitation Act, Plaintiff cannot satisfy the criteria to show it. The court in <u>Young Apartments, Inc. v. Town of Jupiter, FL</u>, 529 F.3d 1027, 1042 (11th Cir. 2008), stated that a plaintiff must show a sufficiently concrete interest in the outcome of the issue in dispute, a close relation to the third party that is being discriminated against, and some hindrance

to the third party's ability to protect his or her own interests. These criteria do not exist here.

As discussed above, Plaintiff does not allege the loss of actual or prospective patients, and without this, Plaintiff fails to assert a sufficiently concrete interest in the outcome of the claims alleged in this action. Plaintiff also does not allege any facts showing it has a close relation to its prospective clientele or that its prospective opioid-addicted patients are unable to protect their own interests. In fact, it does not allege a relationship with any prospective patient. Plaintiff is a for-profit corporation claiming unspecified economic damage; it does not purport to be some sort of advocacy organization with an interest in caring for disabled persons. There is no indication that these prospective patients want or need this for-profit corporation to advocate for them, or that they want the services Plaintiff may at sometime in the future offer. Plaintiff fails to show it has representational standing.

## IV. CONCLUSION[9]

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss [23] is **GRANTED**.

**SO ORDERED** this 16th day of November, 2017.

_William S. Duffey_
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE

---

[9] Because the Court holds Plaintiff lacks standing here, the Court does not address Defendants' additional arguments regarding whether the Eleventh Amendment and Sovereign Immunity bar Plaintiff's damages claims, or whether Plaintiff should be barred from recovering money damages because its Complaint lacks "fact-based allegations of intentional discrimination."